UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| TINA L. ACKERMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 1:14-cv-343 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the

Commissioner filed by the plaintiff, Tina L. Ackerman, on October 30, 2014. For the following

reasons, the decision of the Commissioner is **AFFIRMED**.

*Background*

The plaintiff, Tina L. Ackerman, filed an application for Disability Insurance Benefits

and Supplemental Security Income on October 31, 2011, alleging a disability onset date of

August 12, 2011. (Tr. 10). The Disability Determination Bureau denied Ackerman's application

initially and again upon reconsideration. (Tr. 10). Ackerman subsequently filed a timely request

for a hearing on October 15, 2012. (Tr. 10). A hearing was held on May 2, 2013, before

Administrative Law Judge (ALJ) Terry Miller, and the ALJ issued an unfavorable decision on

May 30, 2013. (Tr. 10–20). Vocational Expert (VE) Sharon D. Ringenberg and Ackerman

testified at the hearing. (Tr. 10). The Appeals Council denied review on August 26, 2014,

making the ALJ's decision the final decision of the Commissioner. (Tr. 1–3).

The ALJ found that Ackerman met the insured status requirements of the Social Security

Act through September 30, 2016. (Tr. 12). At step one of the five step sequential analysis for

determining whether an individual is disabled, the ALJ found that Ackerman had not engaged in substantial gainful activity since August 12, 2011, the alleged onset date. (Tr. 12). At step two, the ALJ determined that Ackerman had the following severe impairments: fibromyalgia with polyarthralgias and chronic back and neck pain, recurrent migraine headaches, restless leg syndrome, obesity, hypertension, and depression/dysthymia. (Tr. 12). At step three, the ALJ concluded that Ackerman did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 13). In determining whether Ackerman had an impairment or combination of impairments that met the severity of one of the listed impairments, the ALJ considered Listing 1.00 and Listing 11.00, fibromyalgia, and Listing 12.04, affective disorders. (Tr. 13).

In finding that Ackerman did not meet Listing 12.04, the ALJ considered the Paragraph B criteria for mental impairments, which required at least two of the following:

> marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

(Tr. 13). The ALJ defined a marked limitation as more than moderate but less than extreme and repeated episodes of decompensation, each of extended duration, as three episodes within one year or once every four months with each episode lasting at least two weeks. (Tr. 13).

The ALJ found that Ackerman had a mild restriction in daily living activities. (Tr. 13). He indicated that she folded laundry, cared for her personal needs independently, watched television, and used a computer. (Tr. 13). He found that Ackerman had moderate difficulties in social functioning. (Tr. 13). Ackerman spent time with her family and friends but had trouble interacting with other people. (Tr. 13). The ALJ found that Ackerman had moderate difficulties in concentration, persistence, or pace. (Tr. 13). He noted that the record did not demonstrate

memory or attention deficits. (Tr. 13). However, Ackerman claimed that she could not follow spoken instructions and had trouble handling stress and changes to her routine. (Tr. 13). The ALJ also noted that Ackerman did not have extended episodes of decompensation. (Tr. 13). She had not been hospitalized for any mental impairments since the alleged onset date and had not experienced any increases in her symptoms along with a loss of adaptive functioning. (Tr. 13–14).

The ALJ concluded that Ackerman did not satisfy the Paragraph B criteria because her mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation of extended duration. (Tr. 14). Additionally, he found that Ackerman did not meet the requirements for Paragraph C. (Tr. 14). The ALJ also indicated that he considered the cumulative effects of Ackerman's obesity on her listed impairments. (Tr. 14). He determined that Ackerman's obesity did not cause her impairments to meet the requirements of the above listings. (Tr. 14).

The ALJ then assessed Ackerman's residual functional capacity (RFC) as follows:

> the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), (i.e. lifting, carrying, pushing, and pulling up to 20 pounds occasionally and 10 pounds frequently; sitting up to 6/8 hours in an eight hour workday; and standing/walking, in combination, up to 6/8 hours in an eight hour workday), except that she is further limited as follows: she needs a sit/stand option, which allows for alternating between sitting and standing up to every 30 minutes, if needed, but the positional change will not render the individual off task. She also is limited to only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; can never climb ladders, ropes, or scaffolds; needs to avoid concentrated exposure to loud noise and bright/flashing lights, as well as hazards (i.e. operation control of dangerous moving machinery and unprotected heights). Furthermore, mentally, she cannot understand, remember or carry out detailed or complex job instructions, but can perform simple repetitive tasks on a sustained basis (meaning eight hours a day/5 days a week or an equivalent work schedule), and must have work

> at a flexible pace (where the employee is allowed some
> independence in determining either the timing of different work
> activities or pace of work). In addition, the claimant can have only
> casual/superficial interactions with others, including supervisors,
> coworkers and the general public.

(Tr. 14). The ALJ explained that in considering Ackerman's symptoms he followed a two-step process. (Tr. 15). First, he determined whether there was an underlying medically determinable physical or mental impairment that was shown by a medically acceptable clinical and laboratory diagnostic technique that reasonably could be expected to produce Ackerman's pain or other symptoms. (Tr. 15). Then, he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Ackerman's functioning. (Tr. 15).

Ackerman testified that she was forty-seven years old, 5'1.5", and 207 pounds. (Tr. 15). She lived with her significant other and his three children. (Tr. 15). She indicated that they received food stamps and that her significant other's job would end in August 2013. (Tr. 15). Ackerman stated that she could drive short distances, read, and write. (Tr. 15). She also stated that she was fired from her last job as a janitor at a college in Huntington for attendance issues. (Tr. 15). Ackerman claimed that her fibromyalgia, restless leg syndrome, and migraines prevented her from working. (Tr. 15).

Ackerman indicated that she was born with hearing loss but that she did not use hearing aids. (Tr. 15). She claimed that she had poor short term memory and depression. (Tr. 15). She also stated that her fibromyalgia caused pain in her skin and deep in her muscles and that her arms and feet went numb. (Tr. 15). Ackerman took Cymbalta, which improved her mood but did not alleviate her pain, for depression and fibromyalgia. (Tr. 15). She also took Flexeril to relax her muscles and Requip to reduce muscle spasms. (Tr. 15). She reported that she had constant headaches and had migraines of varying severity. (Tr. 15). Ackerman stated that she

needed to sit and calm down to dissipate her headaches but that some lasted three to four days and required an emergency room visit. (Tr. 15). She reported that she had a bad migraine once every three months but that she did not take medication for her headaches. (Tr. 15). She also indicated that she was sensitive to light and that stress triggered her severe migraines. (Tr. 15).

Ackerman testified that she could walk only the length of the front of a building without experiencing pain and muscle tightness. (Tr. 16). She testified that she did not need a cane or walker, could sit for half an hour without feeling fidgety, and could lift and carry laundry soap and a gallon of milk. (Tr. 16). However, she had trouble turning doorknobs occasionally and sometimes dropped items, such as a water bottle or coffee cup. (Tr. 16). Ackerman stated that she could do the laundry with help carrying it up and down the stairs, could shop for groceries if the children assisted her, and could care for her personal needs. (Tr. 16). However, she did not leave the house often, and the older children did the dishes, cooking, and cleaning. (Tr. 16).

Ackerman stated that her mind would turn off after watching television for half an hour, that she had blurry vision occasionally, that she had trouble sleeping, and that she slept approximately five hours a night. (Tr. 16). She spent fifteen minutes a day on Facebook, helped the kids with school work, attended church sporadically, and took naps occasionally. (Tr. 16). She claimed that she sat in a recliner with her feet elevated for twenty minutes every hour because of swelling in her legs. (Tr. 16). Additionally, she started receiving mental health treatment in January 2013. (Tr. 16).

Doctors at the Huntington Free Clinic prescribed Ackerman medication for rheumatoid arthritis, restless leg syndrome, and hypertension. (Tr. 16). In May 2012, she underwent a consultative physical examination with Dr. B.T. Onamusi. (Tr. 16). She reported a history of migraine headaches, fibromyalgia, and pain in her neck, back, and joints. (Tr. 16). She also

reported fatigue, memory and attention problems, trouble sleeping, and depression.  (Tr. 16).

Moreover, she claimed sore, achy, and burning pain in her muscles and across her skin, constant,

moderate to severe pain in her neck, back, and joints, recurrent joint swelling, and stiffness in her

joints and back.  (Tr. 16).  Ackerman indicated that she started having headaches approximately

nineteen years ago and that she was diagnosed with migraines.  (Tr. 16).  She claimed that her

migraines incapacitated her approximately three times per year and that she had to go to the

emergency room for shots to relieve the migraines, which could last three to four days.  (Tr. 16).

During the examination, Dr. Onamusi found Ackerman obese at 5'0" tall and 230

pounds.  (Tr. 16).  Ackerman had visual acuity of 20/40 in both eyes and binocular vision of

20/30 without correction.  (Tr. 16).  Her hearing was normal, her memory was unimpaired, and

her attention was satisfactory.  (Tr. 16).  Ackerman had normal reflexes and sensation, a mild

limp, normal hand grip strength, and no muscle strength deficits or edema in her extremities.

(Tr. 16).  She had full range of motion in her joints but with moderate pain, particularly in her

right shoulder.  (Tr. 16).  She also had diffuse tenderness in nearly every joint and muscle of her

upper extremities and hypersensitivity to light touch in her extremity muscles.  (Tr. 16).

Ackerman had diffuse tenderness along her cervical and dorsolumbar paraspinals, no paraspinal

muscle spasms, no definite trigger points, and negative straight leg raise tests.  (Tr. 16).

Considering the above, Dr. Onamusi diagnosed her with migraine headaches and fibromyalgia

with polyarthralgia and chronic neck and back pain.  (Tr. 16).

In May 2012, Dr. Ceola Berry conducted a consultative psychological examination on

Ackerman.  (Tr. 16).  Ackerman informed Dr. Berry that she took Cymbalta for depression.  (Tr.

16).  Dr. Berry found that Ackerman did not demonstrate the signs and symptoms of pain-related

behavior, that she had a euthymic mood and affect, and normal speech.  (Tr. 16).  Dr. Berry also

concluded that Ackerman did not have any significant problems with concentration, short term memory, mental calculations, abstract ability, or general knowledge. (Tr. 16). Dr. Berry determined that Ackerman's somatic complaints exacerbated her alleged anxiety and depression. (Tr. 16–17). Therefore, Dr. Berry indicated that Ackerman's ability to work was affected by her perceived physical limitations primarily and her mood states secondarily. (Tr. 17). Considering the above findings, Dr. Berry diagnosed Ackerman with dysthymia and a GAF of 65. (Tr. 17).

In November 2012, Ackerman started treatment at the Bowen Center. (Tr. 17). She indicated that she had restless leg syndrome and fibromyalgia. (Tr. 17). She also reported that the free clinic took her off pain medication because she had been taking the medication for too long. (Tr. 17). She stated that she was unemployed but had tried to find a job. (Tr. 17). An examination revealed that she had good memory and recall, a sad affect, dysthymic mood, and coherent, linear thoughts. (Tr. 17). Ackerman was diagnosed with major depressive disorder, post-traumatic stress disorder, and a GAF between 55 and 60. (Tr. 17). She was advised to continue individual therapy and prescribed Seroquel and an increased dosage of Cymbalta. (Tr. 17).

Ackerman's therapist, Kelli Woll, found that she had excellent perception, thinking, and memory but was anxious and sad. (Tr. 17). The therapist also indicated that Ackerman felt worthless because she could not provide any income and had trouble with emotional and verbal abuse from her boyfriend. (Tr. 17). In February 2013, Ackerman reported that her medication had improved her mood swings and depression, and Woll noted a bright affect and euthymic mood. (Tr. 17). However, Ackerman reported that she still felt anxious. (Tr. 17).

The ALJ found that Ackerman's medically determinable impairments reasonably could cause the alleged symptoms, but he found Ackerman incredible regarding the intensity,

persistence, and limiting effects of the symptoms. (Tr. 17). He indicated that the treatment record did not support the severity of Ackerman's allegations because it demonstrated that her treatment was routine, conservative, and unremarkable. (Tr. 17). For example, the ALJ stated that Ackerman received treatment a limited number of times at the Huntington Free Clinic and the Bowen Center for depression and dysthymia. (Tr. 17). He noted that her treatment did not include any hospitalizations, surgical intervention, steroids, physical therapy, treatment for pain management, or treatment from a neurologist, orthopedist, or a rheumatologist. (Tr. 17).

Additionally, the ALJ noted inconsistencies between the treatment notes and Ackerman's allegations. (Tr. 18). Despite Ackerman's claims, the ALJ indicated that her physical examinations revealed no visual acuity deficits, no hearing deficits, no extremity sensory deficits, normal grip strength, no trigger points, and no need for an assistive device. (Tr. 18). He also noted that she functioned well psychologically, including no significant limitations with concentration, short term memory, mental calculations, general knowledge, or abstract ability. (Tr. 18). Moreover, he stated that Ackerman had a GAF score between 55 and 65, which indicated moderate to mild symptoms, and that her depressive symptoms were related primarily to situational factors. (Tr. 18). Considering the above, the ALJ concluded that the record did not demonstrate an inability to work. (Tr. 18).

The ALJ found Ackerman incredible because she made inconsistent statements or statements that contradicted the record. (Tr. 18). For example, Ackerman testified that her fibromyalgia caused constant pain but told her therapist in November 2012 that she was not in pain currently. (Tr. 18). The ALJ noted inconsistencies between Ackerman's allegations and her behavior at the hearing. (Tr. 18). Specifically, Ackerman alleged that she could not sit for more than half an hour, but the ALJ observed that she sat for the one hour hearing without major

discomfort.  (Tr. 18).  He also stated that Ackerman could hear and understand his questions at the hearing without difficulty, despite her allegation of hearing loss.  (Tr. 18).  Furthermore, the ALJ indicated that Ackerman ambulated well without a limp at the hearing.  (Tr. 18).

The ALJ considered Dr. Onamusi's opinion, who concluded that Ackerman could perform sedentary to light work.  (Tr. 18).  He also considered the opinions of the DDS medical consultants, who found that Ackerman had no severe mental impairments and could perform light work with restrictions.  (Tr. 18).  The ALJ agreed generally with the above opinions because they were consistent with the record.  (Tr. 18).  However, he found that Ackerman had a severe mental impairment that limited her to simple, repetitive tasks at a flexible pace and superficial interactions with others.  (Tr. 18).  Moreover, the ALJ also included multiple environmental limitations based on Ackerman's allegations of visual, hearing, migraine, obesity, and fibromyalgia issues.  (Tr. 18).

At step four, the ALJ found that Ackerman could not perform her past relevant work.  (Tr. 19).  Considering Ackerman's age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that she could perform, including cashier (500 jobs regionally, 10,000 jobs in Indiana, and 400,000 jobs nationally), office helper (75 jobs regionally, 400 jobs in Indiana, and 30,000 jobs nationally), and hand packager (75 jobs regionally, 1,500 jobs in Indiana, and 300,000 jobs nationally).  (Tr. 19–20).

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive.");

*Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence."); *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098; *Pepper*, 712 F.3d at 361–62; *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Rice v. Barnhart*, 384 F.3d 363, 368–69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. §§ 404.1520, 416.920**. The ALJ first considers whether the

claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. §§ 404.1520(b), 416.920(b)**. If she is, the claimant is not disabled and the evaluation process is over. If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. §§ 404.1520(c), 416.920(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. **20 C.F.R. §§ 404.1520(e), 416.920(e)**. However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f)**.

Ackerman has argued that the ALJ's credibility determination was patently wrong. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013); *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that

is unreasonable or unsupported . . . can the finding be reversed.").  The ALJ's "unique position to observe a witness" entitles his opinion to great deference.  *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006).  However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference.  *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).  Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision."  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see Bates*, 736 F.3d at 1098.

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." **20 C.F.R. § 404.1529(a);** *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004).  If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]."  **20 C.F.R. § 404.1529(c);** *see Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005) ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely

ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence."  SSR 96-7p, at *1; *see Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014) ("'[T]he ALJ cannot reject a claimant's testimony about limitations on her daily activities solely by stating that such testimony is unsupported by the medical evidence.'") (quoting *Indoranto*, 374 F.3d at 474); *Indoranto*, 374 F.3d at 474; *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits.").  Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant.  She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties.  Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities.  (internal citations omitted).

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994); *see Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than "a single, conclusory statement . . . .  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to

the individual's statements and the reasons for that weight." SSR 96-7p, at *2; *see Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015) ("[A] failure to adequately explain his or her credibility finding by discussing specific reasons supported by the record is grounds for reversal.") (citations omitted); *Zurawski*, 245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). He must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). A minor discrepancy, coupled with the ALJ's observations is sufficient to support a finding that the claimant was incredible. *Bates*, 736 F.3d at 1099. However, this must be weighed against the ALJ's duty to build the record and not to ignore a line of evidence that suggests a disability. *Bates*, 736 F.3d at 1099.

Ackerman has argued that the ALJ erred by discounting her credibility based on her conservative treatment. The ALJ discounted Ackerman's credibility because he found her treatment minimal and routine. He noted that she received treatment only a handful of times and that she did not require more extensive treatment measures, including hospitalization, steroids, or surgery. Ackerman has claimed that the ALJ failed to determine why her treatment was sparse before discounting her credibility. She has alleged that she could not afford better and routine treatment. Therefore, she has claimed that the ALJ could not hold her conservative treatment against her without exploring why she did not seek more treatment. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (holding that an ALJ cannot draw a negative inference from a lack of treatment without exploring the claimant's reason for the lack of medical care).

Ackerman also has claimed that the ALJ erred by relying on the minimal physical findings from her examinations. The ALJ noted that Ackerman's examinations revealed limited

physical deficits.  Additionally, he stated that the physical findings contradicted the severity of Ackerman's allegations.  Ackerman has argued that her impairments were not easily identifiable by objective examinations.  Furthermore, she has claimed that the severity of her symptoms varied.  Therefore, she has argued that the ALJ should not have held the physical examination findings against her credibility.  Ackerman also has alleged that the ALJ erred by relying on boilerplate language, by relying on isolated statements, and failing to address her daily living activities.

The Commissioner has argued that the ALJ considered the objective medical evidence, Ackerman's inconsistent statements, and his observations at the hearing to discount Ackerman's credibility.  She noted that the ALJ relied on the normal physical examination findings.  Additionally, she indicated that the ALJ relied properly on Ackerman's conservative and spare medical treatment.  The Commissioner further argued that the ALJ identified multiple inconsistencies that supported his adverse credibility finding.

The ALJ's credibility finding was not patently wrong.  The ALJ cited Ackerman's sparse and conservative treatment to support his adverse credibility finding.  However, the ALJ did not explain why Ackerman failed to seek further treatment.  Therefore, the ALJ should not have drawn a negative inference from Ackerman's lack of treatment.  Nevertheless, the ALJ provided sufficient support to build a logical bridge from the evidence to his credibility finding.

The ALJ explained that the objective medical evidence did not support the severity of Ackerman's allegations.  For example, he noted that Ackerman's physical examinations did not reveal visual, hearing, or sensory deficits.  Moreover, he indicated that Ackerman's grip strength was normal, she did not need an assistive device, and she had no trigger points.  Furthermore, the ALJ stated that Ackerman functioned well psychologically, including no significant problems

with concentration, short term memory, mental calculations, abstract ability, and general knowledge. The ALJ may consider the objective medical evidence when assessing credibility as long as he makes more than a single, conclusory statement. *See* SSR 96-7p, at *2. The ALJ thoroughly explained why the objective medical evidence did not support the severity of Ackerman's allegations.

In addition to relying on the objective medical evidence, the ALJ also identified inconsistencies between Ackerman's statements and his observations at the hearing. He noted that Ackerman could hear and understand his questions at the hearing, despite claiming that she had hearing loss. He also indicated that Ackerman ambulated well without a limp at the hearing, despite claiming that she had trouble walking. Furthermore, he stated that Ackerman sat during the one hour hearing without major discomfort, despite alleging that she could not sit for more than half an hour. The ALJ also noted that Ackerman told her therapist that she was not in pain, despite claiming that her fibromyalgia caused constant pain. The ALJ relied properly on the above inconsistencies to support his adverse credibility finding. *See **Powers v. Apfel***, 207 F.3d 431, 435 (7th Cir. 2000) (holding that a mild inconsistent statement along with the ALJ's observations was sufficient to support an adverse credibility finding).

Although the ALJ should not have drawn a negative inference from Ackerman's conservative treatment, he supported his credibility finding sufficiently. The ALJ explained why the objective medical evidence did not support the severity of Ackerman's allegations. Additionally, he noted multiple inconsistencies between Ackerman's allegations and her actions at the hearing. Moreover, he noted an inconsistency between her allegations and a statement made during treatment. Therefore, the ALJ's credibility finding was not patently wrong.

Next, Ackerman has argued that the ALJ found incorrectly that she did not meet Listing 12.04. For a claimant to show that she meets a listed impairment, she must demonstrate that her impairment meets each required criterion, and she bears the burden of proof in showing that her condition qualifies. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). A condition that meets only some of the required medical criteria, "no matter how severely," will not qualify as meeting a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990).

Section 12.00(A) of the social security regulations describes the structure of the Mental Disorder Listings. To show that she meets the Mental Disorder Listing, the claimant must submit a set of medical findings that support a diagnosis of one of the listed medical impairments. After the claimant has met this burden, the court must assess the severity of the impairment under Paragraph B. **20 C.F.R. § 404.1520a(a)**. Paragraph B sets forth the impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The claimant's functional limitations are assessed by using the four criteria set forth in Paragraph B of the listings: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. **Listing 12.00(C); 20 C.F.R. § 404.1520a(c)(3)**. Each functional limitation must be evaluated to determine the severity, taking into consideration "all relevant and available clinical signs and laboratory findings, the effects of [the] symptoms, and how [the claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." **20 C.F.R. § 404.1520a(c)(1)**. If the degree of limitation is none or mild in the first three categories and none in the fourth, the impairment is not severe. **20 C.F.R. § 404.1520a(d)(1)**. Otherwise, the court will proceed to determine whether the claimant meets

the criteria set forth by the Listing for the specific mental impairment for which she was diagnosed.

To meet or equal Listing 12.04, Ackerman needed to satisfy the requirements for Paragraphs A and B, or to satisfy the requirements for Paragraph C. **20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.04**. Paragraph B required Ackerman to show that her affected disorder resulted in two marked restrictions, or one marked restriction and repeated, extended episodes of decompensation. **20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.04(B)**. The ALJ found that Ackerman did not meet the requirements for Listing 12.04 under the Paragraph B or Paragraph C criteria. Ackerman has argued that the ALJ found incorrectly that she did not meet the Paragraph B criteria. Specifically, she has claimed that she had marked difficulties in maintaining social functioning and concentration, persistence, or pace. The ALJ found that she had moderate difficulties in those areas. She did not challenge the ALJ's findings for daily living activities or episodes of decompensation.

Ackerman has argued that she had marked difficulties in maintaining social functioning. She noted that she did not leave her home often because she felt safe there and that she had withdrawn herself completely from her friendships. Additionally, she has argued that she had marked difficulties in maintaining concentration, persistence, or pace. Ackerman testified that she had short term memory problems, that she could not watch television for more than thirty minutes, and that she could not use the computer for more than fifteen minutes. Therefore, she has claimed that she met the Paragraph B criteria because it required two marked difficulties.

Ackerman also has claimed that the ALJ erred by failing to order an updated opinion on her affected disorder. She has indicated that updated medical records demonstrated that her impairment was severe, despite earlier findings by the state agency doctor. She has argued that

the ALJ played doctor and substituted his own judgment by failing to order an updated opinion. *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record.").

The ALJ supported his step three finding with substantial evidence. As discussed above, Ackerman did not challenge the ALJ's findings that she had a mild restriction in daily living activities and no episodes of decompensation. The ALJ found that she had moderate difficulties in social functioning and concentration, persistence, or pace. He concluded that she had a moderate difficulty in social functioning because she could spend time with family and friends but had difficulty around other people. He determined that she had a moderate difficulty in concentration, persistence, or pace because she did not have any memory or attention deficits but she had trouble handling stress and changes in routine and could not follow spoken instructions.

In support of those findings, the ALJ relied on the opinions of Drs. Lovko and Neville. Dr. Lovko found that Ackerman had mild limitations in daily living activities, social functioning, and concentration, persistence, or pace. Additionally, she found that Ackerman had experienced no episodes of decompensation of extended duration. Dr. Neville affirmed Dr. Lovko's findings. Drs. Lovko and Neville reviewed the record before Ackerman received treatment at the Bowen Center, but no medical sources from the Bowen Center assessed Ackerman's limitations or contradicted their findings. Because Drs. Lovko's and Neville's findings were uncontested, the ALJ could accept their findings to support his Paragraph B conclusions. *See Scheck v. Barnhart*, 357 F.3d 697, 700–01 (7th Cir. 2004).

Ackerman has presented her subjective testimony to support her argument that she had marked limitations. However, as discussed above, the ALJ found her incredible regarding the

severity of her allegations.  Furthermore, the adverse credibility finding was not patently wrong.  Therefore, the ALJ did not need to rely on her subjective complaints.  Additionally, Ackerman has cited Dr. Berry who noted concentration issues during her examination.  However, Dr. Berry's conclusion indicated that Ackerman did not have any significant concentration or short term memory problems.  Thus, Dr. Berry's conclusion did not support Ackerman's argument.

The ALJ was not required to obtain an updated opinion on medical equivalence.  Dr. Neville issue his opinion nine months before the ALJ's decision, and no evidence contradicted his opinion.  Additionally, the ALJ did not play doctor by failing to obtain an updated opinion.  Rather, he relied on the opinions of Drs. Lovko and Neville to reach his conclusion.  Ackerman has not demonstrated that the ALJ should have obtained additional evidence.  *See **Binion v. Shalala***, 13 F.3d 243, 256 (7th Cir. 1994) ("Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand.") (citation omitted).

The ALJ provided substantial evidence to support his finding that Ackerman did not meet the requirements for Listing 12.04.  He explained why Ackerman did not have any marked limitations under Paragraph B or any extended episodes of decompensation.  He also relied on the uncontested opinions of Drs. Lovko and Neville to support his findings.  Furthermore, he found Ackerman incredible and did not need to rely on her subjective allegations.

Finally, Ackerman has argued that the ALJ failed to build an accurate and logical bridge between his RFC assessment and the evidence.  SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation.  In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis.  This section of the Ruling provides:

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted). Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what he must articulate in his written decision. "The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a 'logical bridge' between the evidence and his conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Although the ALJ does not need to discuss every piece of evidence, he cannot ignore evidence that undermines his ultimate conclusions. *Moore*, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected.") (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)). "A decision that lacks adequate discussion of the issues will be remanded." *Moore*, 743 F.3d at 1121.

Ackerman has argued that the ALJ failed to include limitations in the RFC based on her fibromyalgia and memory loss. She noted her subjective complaints based on her fibromyalgia, including dropping items, hand numbness, pain when twisting a door knob, an inability to pick up small items, and an inability to manipulate buttons. Based on those allegations, she has claimed that the ALJ should have included a limitation regarding the ability to manipulate items

with her hands.  Similarly, she has argued that the ALJ ignored her subjective complaints of memory loss, including forgetting to take her medication, difficulty concentrating, and an inability to remember things.  Ackerman has claimed that the ALJ failed to explain why he did not include a limitation based on those allegations.

Ackerman has based her argument entirely on her subjective complaints.  As discussed above, the ALJ found her subjective complaints incredible, which was not patently wrong.  Therefore, the ALJ did not need to rely on her subjective complaints.  However, the ALJ supported his RFC assessment with the objective medical evidence.  He noted that Dr. Onamusi found that Ackerman could perform light physical work and that the reviewing physicians, Drs. Ruiz and Sands, limited to her light work.  The ALJ also referenced the opinions of Drs. Lovko and Neville, who found no severe mental impairments and did not include any mental restrictions.  He also referenced Dr. Berry, who determined that Ackerman had no significant problems with concentration or short term memory.  Ultimately, the ALJ's RFC assessment was consistent with every medical source that assessed Ackerman's functional abilities.  However, he also included environmental limitations based on Ackerman's obesity and fibromyalgia that the medical sources did not include.

Furthermore, the objective medical evidence did not support Ackerman's subjective complaints.  The physical examination findings contradicted her allegation of an inability to manipulate with her hands.  Dr. Onamusi found that she had no trouble using her hands for gross or fine motor tasks, that she had full muscle and hand grip strength, and that she could pick up small items, turn door handles, and handle buttons.  Additionally, Drs. Ruiz and Sands found that Ackerman had no manipulative limitations.  Similarly, the objective medical evidence contradicted her allegations of memory loss.  Dr. Berry concluded that Ackerman had no

significant problem with short term memory.  Moreover, the Bowen Center found that she had no issues with memory.

The ALJ provided a logical bridge from the evidence to his RFC assessment.  He reviewed the objective medical evidence and identified inconsistencies between Ackerman's allegations and the record.  He also explained how the opinion evidence supported his assessment.  The ALJ indicated that his RFC was consistent with the opinion evidence, except that he included more environmental restrictions than the medical sources.  Although the ALJ's RFC assessment was inconsistent with Ackerman's subjective allegations, the ALJ found her incredible regarding the severity of her allegations.  As explained above, the ALJ's adverse credibility finding was not patently wrong and it identified inconsistencies between the record and Ackerman's allegations.  Therefore, the ALJ adequately explained his RFC assessment.

Based on the foregoing reasons, the decision of the Commissioner is **AFFIRMED**.

ENTERED this 16th day of November, 2015.

/s/ Andrew P. Rodovich
United States Magistrate Judge